Vol 10

1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF ALABAMA

2

3       _____

        UNITED STATES OF AMERICA,
4                        Plaintiff,

5       V.                              Criminal Action No. 02-00147-001

6       ROBERT H. RUSH,                 September 3, 2003, 9:36 a.m.
                         Defendant.     Boston, Massachusetts
7       _____

8

9

10

11

12                   TRANSCRIPT OF SENTENCING DAY 3

13              BEFORE THE HONORABLE REGINALD C. LINDSAY

14                   UNITED STATES DISTRICT COURT

15                 JOHN J. MOAKLEY U.S. COURTHOUSE

16                      ONE COURTHOUSE WAY

17                      BOSTON, MA   02210

18

19

20

21

22                    DEBRA M. JOYCE, RPR, CRR
                       Official Court Reporter
23                 John J. Moakley U.S. Courthouse
                    1 Courthouse Way, Room 5204
24                      Boston, MA   02210
                         617-737-4410
25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   TOMMIE BROWN HARDWICK, ESQ.
     JOHN HARMON, ESQ.
 4   Assistant United States Attorneys
     Office of the United States Attorney
 5   One Court Square, Suite 202
     P.O. Box 197
 6   Montgomery, AL   36101-0197
     334-223-7280
 7

 8   FOR THE DEFENDANT:

 9   DAVID B. BYRNE, JR., ESQ.
     150 SOUTH PERRY STREET
10   MONTGOMERY, AL   36104
     334-241-8000
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                 (The following proceedings were held in open court

 3        via teleconference before the Honorable Reginald C. Lindsay,

 4        United States District Judge, United States District Court,

 5        District of Massachusetts, at the John J. Moakley United States

 6        Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

 7        September 3, 2003.

 8                 The defendant, Robert H. Rush, is present with

 9        counsel.   The Assistant United States Attorney is present.)

10                 THE CLERK:   This is criminal action 02-00147,

11        United States v. Robert Rush.

12                 Would counsel please identify themselves?

13                 MR. BYRNE:   My name is David Byrne, I represent the

14        defendant Robert Rush.   Present at counsel table with me is our

15        paralegal Pam Chestnut.

16                 THE COURT:   Good morning, Mr. Byrne.

17                 MS. HARDWICK:   Good morning, your Honor.   I'm Tommy

18        Hardwick representing the government, and co-counsel, John

19        Harmon, is seated at counsel table for the government.

20                 THE COURT:   All right.   Good morning.

21                 Are you still getting those pixels on the screen

22        there?

23                 MS. HARDWICK:   Yes, your Honor, we are.   Earlier it

24        was quite clear.   There were two, I believe, technicians on

25        your end.   We had a very good, clear picture from a distance,
```

'1    but the close-up view, which is what we had before when we were

2    in court, is about the same.

3              THE COURT:  All right.  Is there anything we can do

4    about this?

5              MR. GROSS:  I don't think it has anything to do

6    with the camera location.  It was -- when we connected at first

7    it was crystal clear.

8              THE COURT:  Well, what can we do about this?  We

9    can hang up and try one of the other --

10             Can you hear me, counsel?

11             MS. HARDWICK:  Yes, sir.  We can hear you clearly,

12    your Honor.

13             THE COURT:  I'm going to try again to use another

14    line.

15             MR. BYRNE:  Yes, your Honor.

16             THE COURT:  I'm going to hang up and call again.

17             (Discussion off the record.)

18             THE COURT:  Counsel, can you hear me?

19             MS. HARDWICK:  Yes, sir.

20             THE COURT:  I'm going to take a brief recess and

21    see if we can't straighten out this picture.  So I'm going to

22    leave the bench, and if we can straighten out the picture, I'll

23    be back.  All right?

24             MS. HARDWICK:  Yes, sir.

25             MR. BYRNE:  Yes, your Honor.

 1                THE COURT:  Thank you very much.

 2                (Discussion off the record.)

 3                (Recess taken.)

 4                THE COURT:  Good morning again, counsel.  It looks

 5    as though we have cleared the problem up.  Is that true?

 6                MR. BYRNE:  Yes, your Honor.

 7                THE COURT:  All right.  I apologize for the delay,

 8    and I apologize that we had problems again, that we didn't get

 9    it cleared before now, but -- are you ready to begin?

10                MR. BYRNE:  Ready for the defense, your Honor.

11                THE COURT:  Ms. Hardwick, are you ready?

12                MS. HARDWICK:  Yes, your Honor, ready for the

13    government.

14                THE COURT:  All right.  Let me just remember where

15    we were before.

16                The question that we were considering when we had

17    the ill-fated attempt last time was whether in the first

18    instance Mr. Rush qualifies for the safety valve treatment.

19    The issue with respect to the safety valve -- there are two --

20    one is whether he has disclosed everything truthfully that he

21    knows about the offense and any related offenses; and the

22    second is whether he qualifies by reason of the fact that this

23    is not -- he was not -- there was no violence associated with

24    this crime, he did not possess a firearm in connection with the

25    crime.  And I believe the last time we were together, Mr. Byrne

 1   was speaking with respect to the disclosure aspect.

 2              Have I capped it correctly, Mr. Byrne,

 3   Ms. Hardwick?

 4              MR. BYRNE:  Yes, sir, your Honor.

 5              MS. HARDWICK:  Yes, your Honor.

 6              THE COURT:  I'll hear from you, Ms. Hardwick, after

 7   Mr. Byrne is done.

 8              Okay.  You may go forward, Mr. Byrne.

 9              MR. BYRNE:  Your Honor, when we spoke the last

10   time, the counsel agreed that at issue with the five criteria

11   under the safety valve and the application of the safety valve

12   to these facts focus on items two and five.

13              Counsel also have suggested, and we do not disagree

14   with the issue of whether or not to address issue five; that

15   is, the completeness of cooperation with the government on the

16   date of the offense necessarily comes before the issues which

17   surround item two.

18              With regard to issue five, we intend to call

19   possibly three witnesses in connection with that portion of the

20   defendant's case.  We also expect to call the Court's attention

21   to a transcript that is on file with the Court by the witnesses

22   present, and you may call the case agent in that regard.  We

23   call the Court's attention to what has been previously marked

24   for identification as Defendant's Exhibit 9 for

25   identification.  It should have been transmitted to your

1    Honor.  It purports to be a statement taken by or from the

2    accused by Captain James Majors on or about May 29, 2002, the

3    date of the arrest.

4            We will introduce with regard to Exhibit 2

5    testimony that deals with Exhibit 1, which is the fact that the

6    firearms that were in question were contained in what we will

7    characterize as a gun safe.  It was a lock combination.

8            We expect the evidence would show that during the

9    interview of the Defendant Rush by Captain Majors that he was

10   asked about other marijuana that might be in the house.  At

11   that point he volunteers to show them various locations in the

12   house, consistent with that were certain seeds that were found

13   in the refrigerator and certain marijuana packages that were in

14   the floor of the drug safe.  Inside the gun safe were also

15   firearms, four shoulder weapons, as I recall, and one handgun,

16   a .357 magnum revolver that was in a zippered carrying case.

17   Those -- the witnesses with regard to that will be short.

18           There will be two civilian witnesses that will deal

19   with the type, the nature, and the areas -- and the area in

20   which the accused resides, both as to its rural nature, the

21   presence of wildlife in that area, and the use of those

22   firearms for hunting or recreational purposes would be what we

23   would offer to the Court by way of evidence today.

24           THE COURT:  Mr. Byrne, let me ask you this:  First

25   of all, you reference an Exhibit 9, a statement of the

1    defendant to the officers at the time of the arrest.  I have

2    something that purports to be a statement of that kind, but

3    it's marked as Exhibit 2, Government Exhibit 2.  It's a

4    statement from the Lee County Sheriff's Department, and it

5    purports to be a statement of Robert Haywood Rush, Jr. dated

6    May 29, 2002.  Is that the statement you refer to?

7              MR. BYRNE:  Your Honor, yes.  Your Honor, we

8    submitted it as Exhibit 9.  The government also submitted that

9    as Government's Exhibit 2.  They're one in the same statement.

10             THE COURT:  Okay.

11             MR. BYRNE:  There should be a separate package of

12   documents, 1 through 9, that were submitted to your Honor under

13   separate cover from Ms. Hardwick's office.  Pursuant to the

14   Court's instruction we submitted our exhibits to her and she

15   joined those with her own and forwarded them to the Court.

16             THE COURT:  All right.  I have Government's Exhibit

17   1 through 7 and Defendant's Exhibits 1 through 8.  These

18   exhibits are pretty much overlapping.  I don't have an Exhibit

19   9, but I have Exhibit 2, which is Mr. Rush's statement, and I

20   don't know that I need the second copy of that.  I have what

21   appears to be the original version of it.

22             MR. BYRNE:  Your Honor, the Government's Exhibit 2

23   is sufficient, and we will simply refer to it by that --

24   identify it that way.

25             THE COURT:  Now, before you call your witnesses,

1    Mr. Byrne, let me just inquire, because there may not be any

2    factual dispute as to what happened.

3              I understand the following to have occurred:  That

4    at the time that the officers arrested Mr. Rush, he cooperated

5    with the officers, he told them what essentially is in this

6    written statement; namely, that he disposed of the -- he had

7    been growing the marijuana for 20 years -- although I'm not

8    sure that's in the statement -- that he had been growing the

9    marijuana for 20 years, at some point he told the officers

10   that.

11             MR. BYRNE:  Yes, sir, that's in the --

12             THE COURT:  Is that in the statement?

13             MR. BYRNE:  Yes, sir.  It's the second paragraph,

14   what I referred to earlier as the first --

15             THE COURT:  Yes, I see it, I see it.  He's been

16   growing these plants for 20 years, that he smoked some of it,

17   gave some of it away to friends, and he sold some of it when he

18   had material -- he had stuff left over.

19             I take it that at the time of the arrest nothing

20   further was asked of Mr. Rush; is that right?

21             MR. BYRNE:  No, sir.  Nothing else was asked of

22   Mr. Rush that is recorded.  I intended to ask the

23   government's -- the witness that, if any other questions were

24   asked.  I believe his answer to that question will be that

25   these are the substance of the questions that were asked and

1    the officer's handwritten narrative of what Rush told him on

2    that occasion.

3                 THE COURT:  All right.

4                 MR. BYRNE:  In addition, he basically, your Honor,

5    did three things:  One, he went to the refrigerator, opened

6    that, and removed certain seeds; opened the gun safe and

7    revealed some marijuana that was in baggies.  Those are, I

8    believe, the subject of pictures, both by the government,

9    certain that are among the exhibits the Court has, and also

10   displayed to the agents; certain -- I believe it's Grower's

11   Guide For Marijuana or something like that.  There are four

12   books.

13                THE COURT:  I have a picture of those pamphlets.

14                MR. BYRNE:  Your Honor, and the --

15                THE COURT:  Exhibit 6.

16                MR. BYRNE:  I don't think there's any dispute with

17   regard to that.  We would expect to offer by way of testimony

18   the testimony of the case agent, special agent with the Alabama

19   Bureau of Investigation.  It appears in volume two of the

20   suppression transcript beginning at pages 94 and 95, and I

21   would just, if I can, identify two things:  Beginning at line

22   21 of page 94, the agent is asked this question by

23   Mrs. Hardwick:

24                "You indicated on cross-examination that he had

25   been cooperative.  Would you describe what you mean by

1    cooperative?"

2          The answer: "Based on the statement that he --

3    statements that he gave Captain Majors, just his cooperative

4    demeanor compared to other subjects that we have had in

5    custody, in part, I would say he was very cooperative."

6          He then goes -- down to page 95, beginning at line

7    20, this exchange occurs between the government's attorney and

8    the case agent:

9          "Q.  You stated that you were aware of some

10   communications of Mr. Rush with Captain Majors after May 29.

11         "A.  I spoke with Captain Majors a few days later,

12   and he stated that Mr. Rush had called him in his office,

13   thanked him for the cooperation and the kindness and their

14   professional manner that was conducted by he and his wife at

15   the residence."

16         And that ends the last three words on page 96.

17         Your Honor, we believe that with that by way of

18   proffer on the day of arrest, which as we understand the fifth

19   criteria, was that he cooperated with the government on the

20   date of the arrest.  He admitted the first, the possession of

21   between 112 and 115 marijuana plants.  Second, he cooperated to

22   the extent that with regard to others that might be involved;

23   he excluded his wife as a participant.  He goes further to say

24   that the plants will be transplanted to larger pots and some of

25   them disposed of.  He indicated that he ingested it, and that

1  he had distributed it either at no expense or at some expense

2  to others.

3              He furnished them with the location within his

4  house so that they were not required to do any exhaustive

5  search.  He did that simply because, in fact, he did not want

6  that number of officers going through the house and looking in

7  various locations, so he located it for them.  When he did

8  this, he was in handcuffs.  He opened the combination lock to

9  what I refer to as a gun safe, and I believe it's fairly

10  characterized that way.  That also is in the photographs

11  submitted to your Honor by both the government and by the

12  defense.

13              THE COURT:  I see it.

14              MR. BYRNE:  So he further goes on and describes as

15  far as the cultivation or the manufacture of that in the third

16  segment of his statement that he culled out the male plants and

17  would wind up with about two out of five or six that he saved,

18  and that he would expect probably to have 20 to 25 plants of

19  that number.

20              We suggest that this statement was taken in

21  reference to what I would fairly describe as the -- a broad

22  range of information given to a government agent on that

23  occasion.

24              Secondly, government agents and the case agent in

25  this case has characterized his testimony, I believe, fairly

1    can be characterized as unusual under these types of

2    circumstances.

3              Third, we believe that Government's Exhibit 2 for

4    identification before your Honor is also instructive from what

5    it does not say.  We suggest that there are no questions posed

6    to the witness with regard to any of the firearms, their use or

7    their possession.

8              We also, your Honor, ask the Court and draw the

9    Court's attention to Exhibit 2 for the defendant, which

10   purports to be a listing of those weapons and an indication

11   that they have been checked to determine whether or not those

12   weapons were stolen or were otherwise contraband in the sense

13   that they were either an illegal weapon per say, as in the case

14   of a sawed-off shotgun, or were stolen from some third segment.

15             So, your Honor, we agree that those would probably

16   be the relevant facts that would come forward.  The facts that

17   would come from the two civilian witnesses simply indicate this

18   as a residence that is in the process of being built that is

19   further established by both government exhibits and defense

20   exhibits that have been submitted to your court, and there it

21   basically reflects a structure that is weathered in but has

22   exposed lighting from the ceiling as well as joists,

23   two-by-four framing, et cetera.

24             It further indicates, your Honor, that this is a

25   rural area by way of the approach, which would be the subject

1    of Corporal Howell's testimony.  We expect Corporal Howell to

2    testify that at the time he encountered Mr. Rush at the gate

3    leading to his residence and at that time he posed a question

4    to him having identified himself, he had on an orange marijuana

5    eradication T-shirt, and he asked him if this was his land, or

6    words to that effect, to which Mr. Rush responded that it was.

7                We believe that his testimony would be also that at

8    the time the witness was -- or Mr. Rush was cooperative with

9    him.  He radioed Captain Majors at the house and said that the

10   owner of the subject property is at the front gate, I'm

11   bringing him in, or words to that effect.

12                THE COURT:  Thank you, Mr. Byrne.

13                Ms. Hardwick, tell me what it is that the

14   government contests, first with respect to the question of the

15   degree to which Mr. Rush has cooperated.  I just want to know

16   where the areas of dispute lie.

17                MS. HARDWICK:  Your Honor, the area of dispute is

18   the description and confusing cooperation with full disclosure,

19   and that is addressed in the case United States v. Savir,

20   S-a-v-i-r, which is stated in the government's response.  In

21   that case, what Mr. Byrne has described is cooperation.  That

22   case distinguishes clearly by saying that we agree with the

23   district court that the admissions or of responsibility

24   necessary to obtain a reduction under 3E1.1(a) is not

25   necessarily sufficient to satisfy 3553(f)(5).  What the court

1    says there is that 3553(f)(5), which is the safety valve

2    provision, requires more cooperation than section 3E1.1, which

3    is acceptance of responsibility.

4              Mr. Rush was given the points by probation officer,

5    and the government is not contesting that, for his acceptance

6    of responsibility.  He's been given credit for that, but this

7    case clearly states that that cooperation, which has been

8    described by Mr. Byrne, is not sufficient to satisfy the safety

9    valve.  That's an additional responsibility upon the defendant,

10   and what that responsibility requires is that the defendant

11   provide all information concerning the offense or offenses that

12   were part of the same course of conduct or of a common scheme

13   or plan.  So the court in Savir says whereas 3E1.1 requires

14   that he admits the conduct comprising the offense of

15   conviction, the distinction of the two, there's a significant

16   distinction between the two, he gets the credit for acceptance

17   of responsibility.

18             What the government is saying that Mr. Rush

19   acknowledges that he sold marijuana and that he was growing

20   marijuana.  He did not manufacture the seeds that he used to

21   grow the marijuana.  He purchased them.  Further examination of

22   the evidence that was seized from Mr. Rush's residence

23   indicates that they there were seeds from Amsterdam, there were

24   seeds from Mexico, which would infer that Mr. Rush may have

25   contacts in those areas.

1          In addition, Mr. Rush made the case that he sold

2    marijuana to -- he has not disclosed anyone that he sold

3    marijuana to.  He has not disclosed where he got the seeds

4    from.  That is information that he has been -- he has not

5    answered questions, and each time the government has tried to

6    probe Mr. Rush beyond his basic admission for acceptance of

7    responsibility, the government's been stopped.

8          THE COURT:  Let me ask you that, Ms. Hardwick.

9    When has Mr. Rush been asked about that?

10         MS. HARDWICK:  Your Honor, the government attempted

11   to ask additional questions during his plea colloquy.  The

12   government attempted to ask questions during the suppression

13   hearing.  But before the Court goes further there, the

14   government's position is we don't have to ask him any

15   questions.  The law is clear that the person that is seeking

16   the safety valve, it is incumbent upon that defendant to fully

17   disclose.  He has never offered to be debriefed in any way.

18         THE COURT:  All right.  I --

19         MS. HARDWICK:  It's his responsibility --

20         THE COURT:  I understand your position on that, but

21   it seems to me at some point a person in Mr. Rush's position

22   can take the position if he is not asked that the government is

23   not interested in that, but --

24         MS. HARDWICK:  And the case law has spoken to that,

25   your Honor.

1          THE COURT:  Your answer is that, first of all, the

2    law says he must tell you even if he can reasonably conclude

3    that you're not interested in it.  I don't think the case law

4    says that much.  But you are saying something more to me, I

5    think.  You're saying that --

6          MS. HARDWICK:  Your Honor --

7          THE COURT:  You're saying that you did ask, didn't

8    you?

9          MS. HARDWICK:  Your Honor, we asked -- we attempted

10   to ask before this Court during his plea colloquy.  We

11   attempted to ask additional questions, and there was an

12   objection from Mr. Byrne, and the Court ruled that it was going

13   beyond what he needed to state in order to admit the offense.

14   And that was during his plea colloquy after two witnesses were

15   called in trial.  The Court sustained Mr. Byrne's objection.

16          The only other access that the government has had

17   to Mr. Byrne has been the statement that he gave, which the

18   officers did not know all what was involved in.  They simply

19   seized the evidence that was present.  No one had gone through

20   the little vials that contained the individual seeds that had

21   the little notes that said "Amsterdam" and the year that those

22   seeds were germinated, would be germinated, the notes that said

23   "Mexico."  No one knew of any of those things until they went

24   through the evidence further.

25          Your Honor, the position of the government is

'1   that -- and I will find the case -- says that whether the

2   government solicits the information or not, the defendant

3   cannot come forward and state that I'm seeking the safety valve

4   that does not fully disclose.  And if I can have a moment, your

5   Honor, I'll find that statement.

6              THE COURT:  I think I know the case.  It's one of

7   those cases like Flanagan or so.  I've seen the case.  There is

8   also case law to the effect, you know, that at some point he

9   doesn't -- Mr. Rush doesn't have to -- you know, if the

10   government doesn't appear to be interested in the information,

11   he doesn't have to come forward.  Does he?

12             MS. HARDWICK:  Your Honor, he does, because he is

13   seeking the safety valve.  Now, if all he wants is acceptance

14   of responsibility, that's fine.  He's seeking more than

15   acceptance of responsibility.  He wants the points that he's

16   received, the three levels for acceptance of responsibility,

17   that's cooperation.  The Savir case clearly distinguishes that

18   there is a difference, and the Court should acknowledge a

19   difference between acceptance of responsibility from

20   cooperation for the offense.

21             The safety valve case goes beyond that.  This is a

22   position where the defendant is coming to the Court and saying

23   not only do I get acceptance of responsibility, I am entitled

24   to the safety valve because I've told you everything I know.

25   Your Honor, I believe the case that the government is referring

`1 to, and the Court has mentioned it, is the Flanagan case.  And

2 the government references page 143 of that case where it says

3 the court has not addressed the question whether the government

4 has the burden to solicit information from the defendant in the

5 context of the safety valve provision.  The 4th Circuit has

6 addressed this specific question and determined that the burden

7 is on the defendant to demonstrate that he has supplied the

8 government with truthful information regarding the offenses at

9 issue.  And then it goes on to talk about the fact that it's

10 not the government's burden here, it's on him to disclose.  And

11 I think what he's confusing is his acceptance of

12 responsibility, which the government is not going to dispute,

13 at the time of the offense Mr. Rush cooperated.  But Mr. Rush

14 is asking for more than acceptance of responsibility under

15 3E1.1.  You can't do the same amount of cooperation and get

16 double credit for it, get credit for it under acceptance of

17 responsibility and then get credit for it under the safety

18 valve.

19              The safety valve is an additional reduction that

20 the sentencing guideline and the statute has written in to give

21 to those defendants who go beyond mere acceptance of

22 responsibility.  He's done nothing beyond acceptance of

23 responsibility.  Everything that he disclosed in his residence

24 would have been found whether he disclosed it or not.  Even

25 Mr. Byrne acknowledges that Mr. Rush gave that cooperation

1   material facts."  I'm not suggesting that any of that happened

2   here, I just need to understand what conduct Mr. Rush

3   reasonably might have expected -- I mean, what Mr. Rush might

4   reasonably have expected to have done under all the

5   circumstances, and I think that it may be helpful in that

6   regard for me to hear from the case agent.

7              MS. HARDWICK:  Your Honor, before the Court does

8   that, the government would ask the Court to keep in mind what

9   happened on May 29th.  The case agent went in, there was an

10  eradication team, the case agent went in and transported

11  Mr. Rush.  They searched his premises.  The evidence wasn't

12  even gone through at that point.  The distinction that the

13  government would ask the Court to be mindful of is that in that

14  case there was a debriefing, if I recall the case correctly.

15             THE COURT:  Yes.

16             MS. HARDWICK:  We've never had an opportunity to

17  debrief Mr. Rush.  That's never happened.

18             THE COURT:  I understand that.

19             MS. HARDWICK:  That's to say that's the only

20  difference we'd say to the Court.  We've never had the

21  opportunity, and we've been cut off asking Mr. Rush questions.

22             THE COURT:  I take your point.  You say there has

23  not been a proffer to you, to the government, apart from what

24  happened on the day of the arrest; isn't that right?  Isn't

25  that what you're saying?

1          MS. HARDWICK:  That is correct, your Honor, and we

2    say further that being that he is the person who is seeking the

3    benefit of the safety valve, that is his responsibility.  The

4    case law I believe is clear, that we don't have to solicit him

5    to come in and seek the safety valve.  That is something he's

6    doing.

7          THE COURT:  I understand.

8          MS. HARDWICK:  Therefore, he should not come in and

9    get the benefit of both sides.

10         THE COURT:  I understand.  Let me have the case

11   agent, Mr. Byrne.

12         MR. BYRNE:  Your Honor, may I get some further

13   instruction from the Court and make sure that the Court perhaps

14   did not misunderstand what I was attempting to say to the

15   Court?

16         The case agent in this case is Special Agent Lance

17   Abbott.  He arrives at the scene after the defendant is taken

18   into custody by Captain Majors.  Captain Majors takes both Rush

19   and his wife into the residence in handcuffs and undertakes the

20   interrogation.  I believe Abbott was there some of the time but

21   not all of the time.  Ms. Hardwick is correct in that he

22   transported the defendant the following day from the Lee County

23   jail, and we would expect at that point there were no -- there

24   was no interrogation of Mr. Rush during the course of that

25   transport other than a question that is characterized by I

Page 23

1    don't know how you got away with this, or words to that effect,

2    for 20 years, or could expect to; but other than that, he will

3    say that he did not examine Mr. Rush.

4            We also know that when Mr. Rush called Captain

5    Majors after the day of arrest, there was no further or

6    follow-up question asked by Captain Majors to Mr. Rush.  With

7    that distinction being made, I'm prepared to put either or both

8    before the Court.

9            THE COURT:  Maybe we ought to start with Captain

10   Majors.

11           MR. BYRNE:  All right, sir.

12           Your Honor, this is my first time to use it.  Would

13   you like for Majors to stand next or at the podium?  Is that --

14           THE COURT:  That would be easier because I can see

15   him well enough at the podium.  There's a courtroom deputy

16   there, maybe he can administer the oath.

17           JAMES MAJORS, having been duly sworn by the Clerk,

18   was examined and testified as follows:

19                    DIRECT EXAMINATION

20   BY MR. BYRNE:

21   Q.  Please state for the Court your name.

22   A.  James Majors.

23   Q.  By whom are you employed?

24   A.  Lee County Sheriff's Office.

25   Q.  On May 29, 2002 what was your position with the Lee County

 1  Sheriff's Office?

 2  A.  I was the captain assigned to the investigation division.

 3  Q.  On May 29, 2002, prior to the afternoon hours of that day,

 4  did you or anyone to your knowledge have probable cause to

 5  believe that Robert Rush had committed an offense?

 6  A.  No, sir.

 7  Q.  As the events of the afternoon of May 29, 2002 took place,

 8  did you have occasion to go to a location in rural Lee

 9  County --

10  A.  Yes.

11  Q.  -- known as the Rush residence?

12  A.  Yes, sir, I did.

13  Q.  Would you describe in general that area on which his

14  residence stands?

15  A.  It's a rural area of west Lee County.  The residence is

16  situated close to a creek off a dirt road.

17            THE COURT:  Situated close to what off a dirt

18  road?

19            THE WITNESS:  A creek.

20            THE COURT: Okay.

21  Q.  Is that area known generally as Rattle Snake Road or Rattle

22  Snake Ridge?

23  A.  Yes, sir.

24  Q.  And do you know why it's denominated that way?

25  A.  No, sir, but I've always known it to be called that but I

`1    don't know why.

2    Q.   Okay.  When you arrived at that residence, did you find the

3    gate to the residence closed?

4    A.   Yes.

5    Q.   Let me show you what is marked for identification as

6    Defendant's Exhibit 6 --

7              MS. HARDWICK:  Your Honor, the government is going

8    to object to this line of questioning.  That's evidence that

9    has been previously dealt with in a suppression hearing.  We

10   ask the Court to limit the examination of this officer to the

11   issues that are before the Court on sentencing.

12             MR. BYRNE:  Your Honor, Ms. Hardwick is correct.

13   The admission of Exhibit Number 6 touches upon item two, and I

14   was simply going to try to address two and five at one time,

15   but I can limit that simply to the questions which surround

16   cooperation if the Court pleases.

17             THE COURT:  All right, would you?

18             MR. BYRNE:  All right.

19             THE COURT:  All right.  So you're withdrawing that

20   question?

21             MR. BYRNE:  I'll withdraw that question, your

22   Honor.

23   BY MR. BYRNE:

24   Q.   Was Mr. Rush brought to your location at the residence by

25   Corporal Howell?

1    A.    Yes, sir.

2    Q.    And who do you know Corporal Howell to be?

3    A.    A trooper with the Department of Public Safety.

4    Q.    And when he brought Mr. Rush to your immediate vicinity,

5    what did you do next?

6    A.    Identified myself and made sure that Mr. Rush was the

7    property owner.

8    Q.    And at that time did you determine whether or not he had

9    any weapons on his person?

10   A.    I can't remember if it was myself or someone else who

11   searched him, but he did not have any weapons that I'm aware

12   of.

13   Q.    Now, at some point was he and Maria Rush handcuffed?

14   A.    Yes, sir, they were.

15   Q.    At some point were they later taken into the residence?

16   A.    Yes, sir, they were.

17   Q.    And did they -- at that time did you direct or suggest that

18   they sit down at a table?

19   A.    Yes, sir, I did.

20   Q.    And was that where the interrogation began?

21   A.    Yes, sir.

22   Q.    I show you what is marked for identification as Defendant's

23   Exhibit Number 7 marked for identification.  Can you identify

24   that as the residence and the table at which you, Maria Rush,

25   and Bob Rush sat for the purposes of interrogation?

1    A.   Yes, sir, that is.

2              MR. BYRNE:   Exhibit 7 for identification is offered

3    into evidence as Exhibit Number 7, your Honor.

4              THE COURT:   All right.  Any --

5              MS. HARDWICK:   Your Honor, we object.

6              THE COURT:   You object to this?

7              MS. HARDWICK:   I do, your Honor.  It has nothing to

8    do with the issues before the Court, whether or not Mr. Rush

9    cooperated and went beyond acceptance of responsibility; and it

10   has nothing to do with the other issue that is before the Court

11   for sentencing, which is, whether or not there was a gun in

12   relationship to this offense.

13             THE COURT:   Well, let me -- do you intend to elicit

14   from this witness, Mr. Byrne, about how this material was

15   found?

16             MR. BYRNE:   Yes, sir.

17             THE COURT:   All right.  You may have the question.

18   I overrule the objection.

19   BY MR. BYRNE:

20   Q.   You may answer.

21   A.   Yes, sir.  This photograph represents the way the inside of

22   the Rush kitchen area --

23             THE COURT:   Exhibit 7 is received into evidence.

24             (Exhibit 7 received into evidence.)

25             MR. BYRNE:   Yes, your Honor.

1    Q.   At the area of what I'm going to call the kitchen table,

2    did you undertake to advise Robert Rush of his rights and then

3    take his statement from him?

4    A.   Yes, sir, I did.

5    Q.   Let me show you what is marked for identification as

6    Government's Exhibit Number 2 for identification and ask you if

7    you can identify that document.

8    A.   This is -- looks to be a copy of the statement form that I

9    used and recorded the statement taken from Mr. Rush.

10   Q.   How can you identify Exhibit 2 as such?

11   A.   It has Mr. Rush's name and my signature on it.

12             MR. BYRNE:   Your Honor, Exhibit Number 2 is being

13   offered into evidence for identification as Government's

14   Exhibit 2 and as defendant's exhibit.

15             THE COURT:   Okay.   This is the same document that I

16   have that's marked as Government Exhibit 1?   It's captioned

17   "Your Rights."

18             MR. BYRNE:   No, your Honor.   What I marked

19   Government's Exhibit Number 2 is the statement.

20             THE COURT:   Okay, I'm sorry.   Yes.   I'm sorry.   I

21   have it.   Is there an objection to Government Exhibit 2?

22             MS. HARDWICK:   Your Honor, I don't know that it's

23   proper for Mr. Byrne to offer the government's exhibit, but for

24   his use during this proceeding, the government, with permission

25   of the Court and Mr. Byrne, would offer it as Exhibit 2 into

1    evidence to be referred to in this proceeding.

2                THE COURT:  All right.  Exhibit 2 is admitted.

3                (Exhibit 2 received into evidence.)

4    BY MR. BYRNE:

5    Q.  Let me ask you to please draw your attention to this

6    document.  It indicates that the statement is taken apparently

7    into three segments; is that correct?

8    A.  Yes, sir.

9    Q.  Do you recall the duration of your interview of Mr. Robert

10   Rush on that evening?

11   A.  Yes, sir.

12   Q.  How long from beginning to end did the interview last?

13   A.  The first segment probably 10 or 15 minutes.  After the

14   first segment was taken, I went outside the residence, looked

15   at the plants and came back and I had noticed some large tubs

16   in the yard, and that's what the second amendment is reference

17   to.

18   Q.  Now, pause at that point.

19                As I understand it, at or before what has been

20   marked and introduced as Government's Exhibit 2, before the

21   statement was taken, had you gone to the rear of the residence

22   and seen approximately 112 to 116 plants in pots adjacent to

23   the curtilage of the house?

24   A.  It's been so long, I really don't recall whether I saw them

25   before or after we sat down to take the first part of the

1    statement.

2    Q.  Let me show you what is marked as Defendant's Exhibit

3    Number 8 for identification.

4              Your Honor, this should be in the packet of

5    documents that the Court has.

6              THE COURT:  Okay.  Let me just -- yes, I have it.

7    This is described in your list as photo from behind the house.

8              MR. BYRNE:  Yes, sir, your Honor.

9              THE COURT:  Okay.  And, by the way, I just found

10   your Exhibit 9, too, which is the same as Government Exhibit

11   2.  All right.

12             Any objection to Exhibit 8, Ms. Hardwick?

13             MS. HARDWICK:  No, your Honor.

14             THE COURT:  All right.  8 is received in evidence.

15             (Exhibit 8 received into evidence.)

16   BY MR. BYRNE:

17   Q.  With respect to Exhibit 8, and looking at it to refresh

18   your recollection, can you identify that as a photograph taken

19   by law enforcement officers on May 29, 2002?

20   A.  Yes, sir.

21   Q.  And on that occasion and before what I'm referring to on

22   Government's 2, also marked as Defendant's 9, before the second

23   passage or second full paragraph did you go to the area

24   depicted on Exhibit 8 before returning to the house?

25   A.  Yes, sir.

1   Q.   At that time and before commencing the second interview,

2   had you satisfied yourself that there were, in fact, as

3   Mr. Rush suggested in his statement, 112 to 115 marijuana

4   plants?

5   A.   I did not count them individually before I went in, no,

6   sir.

7   Q.   Could you tell from the number of plants there as they're

8   depicted on the ground and as depicted in Exhibit 8 that there

9   were a large number of plants that were identified by you as

10  marijuana plants?

11  A.   Yes, sir.

12  Q.   Did he indicate that those plants were, in fact, growing on

13  the property in the pots as they are depicted?

14  A.   Yes, sir.

15  Q.   During the initial phase, did he advise you that his wife

16  did not have anything to do with the manufacture or cultivation

17  of --

18  A.   Yes.

19              MS. HARDWICK:   Your Honor, we would object to this

20  line of questions.   It's not going to the core of -- it's

21  rehashing the suppression hearing that we had for two days.   It

22  is not going to the core of the two primary issues before this

23  Court as far as we've both admitted this is a statement, it's

24  in evidence now, the Court can give it whatever weight.   These

25  are the questions and information that it contained.   They're

1   not disputed, and it's going beyond the two questions that are

2   before the Court on his disclosure, his full disclosure.

3                    THE COURT:   Overruled.

4   BY MR. BYRNE:

5   Q.   Did he indicate that his wife did not have anything to do

6   with the manufacture of the marijuana plants?

7   A.   Yes, sir, that's correct.

8   Q.   Based upon what other agents that had arrived on the scene

9   earlier, that is, to be sure Hobbes and Hall, did their

10  observation indicate anything other than what he told you about

11  the plants and the participation about his wife as being true?

12  A.   I'm sorry, would you repeat that?

13  Q.   Let me shorten it.

14  A.   Okay.

15  Q.   Did you have any question as to -- regarding the first

16  passage, did you have any question as to whether or not what he

17  was telling you was true when he said he grew the plants, that

18  he had smoked it, and that he had distributed to others?

19  A.   At that point I believed that to be true, yes, sir.

20  Q.   Now, before the second -- what I'm going to call the second

21  addendum, which is the middle paragraph on page one of

22  Government's 2, you had asked him certain questions with regard

23  to larger pots that you had seen.

24  A.   Yes, sir.

25  Q.   Where were those pots located, the larger pots, in relation

1    to the scene depicted in Exhibit 8?

2    A.  As you -- looking at Exhibit 8, on the opposite side of the

3    house along the wood line.

4    Q.  Okay.  When you saw the large pots, at that point you had,

5    in effect, walked both in front of and behind the residence --

6    A.  Yes, sir.

7    Q.  -- of Robert Rush.  Is the second paragraph then what we

8    would call supplemental investigation in the form of

9    questioning by you?

10   A.  Yes, sir.

11   Q.  And based upon your physical observations, what information

12   did he give you about the larger pots?

13   A.  As in the statement, he said that the larger tubs, that

14   they were pretty good sized tubs, he had planned to use those

15   to transplant the plants in later.

16   Q.  Now, up to this point had he gone to the refrigerator or to

17   what I have referred to as the gun safe or any other location

18   in the house and removed any other evidence or what you

19   believed might be evidence?

20   A.  Yes, sir.

21   Q.  Did he go to those areas of the house prior to the second

22   paragraph shown on Government's 2?

23   A.  Yes, sir.

24   Q.  Let me show you the photograph that is marked for

25   identification as Government's Exhibit Number 5 and ask you if

1  you can identify -- excuse me, Defendant's Exhibit Number 5 for

2  identification, and ask you if you can identify that gun safe.

3  A.  Yes, sir, that appears to be the gun safe in the Rush

4  residence.

5  Q.  And let me also show you Government's Exhibit 3 for

6  identification, which is a little bit larger photograph of the

7  same item.  Can you identify Government's Exhibit -- I mean

8  Defendant's Exhibit 3?

9  A.  Yes, sir, that appears to be the same safe.

10           MR. BYRNE:  Defendant's Exhibit 3 and 5 for

11  identification are offered.

12           MS. HARDWICK:  No objection.

13           THE COURT:  3 and 5 are admitted.

14           (Exhibits 3 and 5 received into evidence.)

15           MR. BYRNE:  We offer Defendant's Exhibit 3 and 5

16  for identification.

17           THE COURT:  Yes, I've received those in evidence.

18           MR. BYRNE:  I apologize to the Court.

19  BY MR. BYRNE:

20  Q.  Now, was Mr. Rush seated at the table -- and following the

21  first passage on Government's Exhibit 2 and -- what did you say

22  to him or what did he say to you to leave his seat and go to

23  some other area of the house, i.e., the refrigerator or gun

24  safe?

25  A.  He agreed to take us through the residence and show us the

1   location of all the drugs he had in the house.

2   Q.   Did you ask that he do that?

3   A.   Yes, sir.

4   Q.   And then you asked him if he would do that, what did he say

5   to you?

6   A.   He agreed.

7   Q.   And at that point in time when he agreed, how many officers

8   besides yourself were in the room?

9   A.   There were myself and one other officer.  At some point in

10  time there were as many as two other officers.

11  Q.   Where did he go first in response to your questions and in

12  his answer that you would find any other drugs that were

13  located in the house?

14  A.   If I recall right, he went to the refrigerator first.

15  Q.   And what did you observe him do?

16  A.   Mr. Rush removed a brown paper bag and some other

17  containers that had seed, vegetable matter in them.

18  Q.   Let me show you, if I may, what is marked as Defendant's

19  Exhibit 2 for identification, and ask you to draw your

20  attention to the top photograph.

21          Do you recognize Defendant's Exhibit 2 for

22  identification, the top photograph, as being the kitchen area

23  and the refrigerator in the Rush residence?

24  A.   Yes, sir, that appears to be it.

25  Q.   Does Defendant's Exhibit 2 fairly and accurately depict the

1    scene on May 29, 2002?

2    A.   Yes, sir.

3              MR. BYRNE:   Defendant's Exhibit 2 for

4    identification is offered.

5              THE COURT:   Any objection to 2?

6              MS. HARDWICK:   No, your Honor.

7              THE COURT:   2 is received into evidence.

8              (Exhibit 2 received into evidence.)

9    BY MR. BYRNE:

10   Q.   Now, before he removed items from the refrigerator, where

11   did he place them?

12   A.   I really don't remember.

13   Q.   Do you know if he gave them to you or to another law

14   enforcement officer inside the residence?

15   A.   Yes, sir.

16   Q.   Did they consist of seeds that were in vials?

17   A.   The -- I want to say the majority of the seeds were in a

18   plastic 35 millimeter film canister holders.

19   Q.   And if you look at the last sentence of the first paragraph

20   on Exhibit 2, you indicate that, "I also have some bags and

21   containers of seed."  Based upon what he withdrew from the

22   refrigerator, did you determine that that statement was

23   truthful?

24   A.   Yes, sir.

25   Q.   After withdrawing those items from the refrigerator and

1   placing them somewhere in the house, did he then go to some

2   other location?

3   A.  Yes, sir, he did.

4   Q.  Where did he go next?

5   A.  He went to the safe.

6   Q.  At this point, both with the refrigerator and the safe, did

7   Mr. Rush remain handcuffed?

8   A.  Yes, sir.

9   Q.  And up to that point in time, did you see visible at any

10  point in any of the rooms that you both -- either in the house

11  or out, a gun in plain sight?

12  A.  No, sir.

13  Q.  There is depicted on the exhibit marked number 5, which is

14  the gun safe, what appears to be some kind of blue covering.

15  Can you tell the Court what that was and how, if at all, it

16  covered the gun safe?

17  A.  I believe that was a bed sheet.  It was draped completely

18  over the front of the gun safe.

19  Q.  Did he open the combination for you?

20  A.  Yes, sir, he did.

21  Q.  When he opened the combination, did he withdraw the items

22  inside the safe or did you as the single law enforcement agent

23  on site withdraw what was inside the gun safe?

24  A.  I believe I did, but it's been so long I can't say for sure

25  if he got the bucket out or if I got the bucket out.

1   Q.  Contained in the bucket was there marijuana?

2   A.  Yes, sir, there was.

3   Q.  Contained within the gun safe were there five shoulder

4   weapons and one handgun?

5   A.  There was a Ruger revolver and some long guns.  I don't

6   remember or recall the exact number of long guns.

7   Q.  Let me show you what has been marked as Defendant's Exhibit

8   Number 1, and ask you if you can identify that exhibit.

9   A.  Yes, sir, I can.

10  Q.  What is it?

11  A.  This is a copy of notes I made of some weapons and serial

12  numbers, also Mr. Rush's biographical information that I gave

13  to communication officers to check serial numbers.

14  Q.  Does Defendant's Exhibit 1 for identification contain your

15  handwriting?

16  A.  Yes, sir, it does.

17  Q.  Was this made on the day of the arrest, May 29, 2002?

18  A.  Yes, sir.

19  Q.  And to the best of your knowledge, did this accurately

20  reflect the inventory of the gun safe with respect to weapons

21  on May 29, 2002?

22  A.  All except for one weapon, the Winchester .243 rifle was in

23  the garage upstairs area of the garage building next door.

24  Q.  Okay.  Was it in a gun case?

25  A.  Yes, sir, it was.

1    Q.    In addition to what was located -- that is, weapons that

2    were located in the gun safe, did either Mr. Rush or did you

3    withdraw a number of books relative to the growing of marijuana

4    plants?

5    A.    Yes, sir, we did.

6    Q.    Were there four such books?

7    A.    Between three and five.

8    Q.    With respect to --

9                MR. BYRNE:    Your Honor, I am going to use for

10    identification purposes what is marked as Government's Exhibit

11    6.

12                THE COURT:    Yes.

13                MR. BYRNE:    And, your Honor, I'll either offer that

14    as Government's Exhibit 6, but I'm not the government, or I

15    will remark it as Defendant's 10 for purposes of this hearing,

16    whichever the Court -- would please the Court.

17                MS. HARDWICK:    Your Honor, if the Court will accept

18    it being offered out -- consistent with the procedure, the

19    government would offer Exhibit 6.

20                THE COURT:    All right.    Let's take Government's

21    Exhibit 6 as received in evidence.    We'll call it Government

22    Exhibit 6.

23                (Exhibit 6 received into evidence.)

24                THE COURT:    Excuse me, Mr. Byrne, had you left

25    Exhibit 1, your Exhibit 1?

1             MR. BYRNE:  No, sir, not yet.

2             THE COURT:  Okay, sorry.

3             MR. BYRNE:  I put it aside.  I remember I did not

4  finish my examination on it.

5             THE COURT:  All right.

6             MR. BYRNE:  Let me go back to Exhibit Number 1, if

7  I may.

8             THE COURT:  Yes.

9  BY MR. BYRNE:

10  Q.  Did you ascertain the serial numbers on these weapons?

11  A.  Yes, sir.

12  Q.  And are those listed on the right side of Defendant's 1?

13  A.  Yes.

14  Q.  There appears with regard to four of the five entries the

15  word "clear."  Is that your handwriting?

16  A.  No, sir.

17  Q.  Was that placed there later by someone else?

18  A.  Yes, sir.

19  Q.  And what does the word "clear" next to those serial numbers

20  indicate to you as a law enforcement officer?

21  A.  That they are not reported stolen.

22  Q.  On that occasion and on that evening, did -- were you aware

23  before leaving the residence on May 29, 2002 that the weapons

24  contained in the gun safe were not stolen?

25  A.  No, sir.

'1   Q.   Did you later determine that they were not stolen?

2   A.   Yes, sir.

3   Q.   Did you leave the weapons in the residence of Robert Rush

4   that evening when you transported Rush to the Lee County jail?

5   A.   Yes, sir.  We secured them back in the safe.

6            THE COURT:  May I ask a question of the captain,

7   please?

8            MR. BYRNE:  Yes, your Honor.

9            THE COURT:  Two questions.  One of these weapons,

10   it looks like an Ithaca; is that right?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  That is not marked "clear."  Can you

13   explain that?

14            THE WITNESS:  Yes, sir.  A lot of different

15   manufacturers of weapons have, if I -- let me say it this way.

16   The Smith & Wesson might have the same serial number as a Colt

17   or another made weapon, but when the number is run, it comes

18   back -- if it's been reported stolen, it comes back

19   automatically for anything, but after you check the model

20   number, you can exclude it, that it -- we got a hit back on

21   this serial number, but it did not come back to this gun, if I

22   haven't confused you enough.

23            THE COURT:  No, I understand.  You got that serial

24   number, but it did not refer to this weapon.

25            THE WITNESS:  Right.  This serial number is

1    reported stolen but on another type of weapon.

2                   THE COURT:  All right.  The question I want to ask

3    you, were any of these weapons loaded?

4                   THE WITNESS:  I don't believe that they were.

5                   THE COURT:  Okay.  All right.  Thank you.

6    BY MR. BYRNE:

7    Q.  Referring now back to Exhibit Number 2, Government's

8    Exhibit 2, after the second passage, which appears to be the

9    second full paragraph, did you do some further investigation

10   which led to the interrogation that begins the last three

11   pages -- three lines of page one and continues on page two?

12   A.  Yes, sir.

13   Q.  What investigation did you conduct prior to what I'm going

14   to call for the third segment of interrogation with Robert

15   Rush?

16   A.  Actually, this was volunteered by Mr. Rush when he had

17   asked earlier about bond, what he had to do to make bond there

18   at Lee County jail.  After conferring with the state

19   investigator and we decided or his supervisor wanted to adopt

20   the case in federal court, I had to explain to Mr. Rush that

21   the bond procedure would be different, and I explained to him

22   the reason why the case was going to go federal was because

23   there was more than 100 plants, and that's when he explained to

24   me about the culling out number of plants and why you would

25   have less plants.

1   Q.  And so what appears at the bottom of page one of Government

2   2 and the top of page two was additional information that he

3   furnished to you in the course of the investigation.

4   A.  Yes, sir.

5   Q.  Based upon your investigation on that evening, were any of

6   the statements made as they appear on Government's Exhibit 2

7   untrue?

8   A.  No, sir.

9   Q.  In the course of the investigation, did you ascertain from

10  any other source -- well, withdraw that question.  Let me ask

11  you a different one.

12          Who transported the physical evidence back to the

13  Lee County Sheriff's Office?

14  A.  Myself and Lance Abbott.

15  Q.  On the evening of May 29, 2002, did you individually

16  transport Robert Rush to the Lee County jail?

17  A.  I can't recall if he was transported back in my car or a

18  marked car.

19  Q.  To your knowledge, on the night or afternoon or early

20  evening hours of May 29, 2002, did you ask any other questions

21  of Robert Rush that are not reflected on your statement that

22  you took on that evening?

23  A.  I'm sure that we asked him lots of questions, but nothing

24  that was relevant to the issues of the case.

25  Q.  Did he refuse to answer any of your questions that night?

 1   A.   No, sir.

 2   Q.   With regard to the following day, I believe the item shows

 3   that Special Agent or ABI Lance Abbott brought the subject from

 4   the Lee County jail to the federal facility here in

 5   Montgomery.  Are you aware of that or not?

 6   A.   No, sir, I do not know that.

 7   Q.   I'll withdraw the question from the witness.

 8             Did you and the other agents and deputies that

 9   conducted the investigation on May 29th have an opportunity to

10   review the evidence, physical evidence that you had obtained

11   that evening?

12   A.   Yes, sir.

13   Q.   After reviewing the evidence obtained on May 29, 2002, did

14   you have occasion to receive a phone call from Robert Rush?

15   A.   Yes, sir.

16   Q.   And at that time did he thank you for the courteous manner

17   in which you treated he and his wife?

18   A.   Yes, sir, he did.

19   Q.   On that occasion, after reviewing the evidence, did you

20   have any further questions that you wished to ask of him?

21   A.   Not at that time, no, sir.

22   Q.   Prior to the prosecution of this case both at -- withdraw

23   that question.

24             Other than the interrogation carried out on that

25   evening, have you attempted to contact Robert Rush and

1    interrogate him further?

2    A.   No, sir.

3             MR. BYRNE:   Those are my questions, your Honor.

4    I'm done with this witness.

5             THE COURT:   Thank you very much.

6             Ms. Hardwick, do you have any questions of Captain

7    Majors?

8             MS. HARDWICK:   Yes, sir.

9                      CROSS EXAMINATION

10   BY MS. HARDWICK:

11   Q.   Captain Majors, you indicated that you reviewed the

12   evidence.  Was that a thorough review or a courtesy review?

13   A.   It was not thorough.

14   Q.   When you say it was not thorough, were there other things

15   that you later learned --

16   A.   Yes, ma'am.

17   Q.   -- contained in the evidence?

18   A.   Yes, ma'am.

19   Q.   I'm going to reference you particularly at the time that

20   Mr. Rush called you a couple of days later and thanked you for

21   your courtesy.  Did you know anything about the germination

22   dates that were contained on the seeds in various parts of the

23   evidence?

24   A.   Some of them, yes.

25   Q.   Did you know anything about evidence that had been --

'1    germination dates, did you know anything about seeds from

2    Amsterdam?

3    A.   We had not found that one at that time.

4    Q.   Had you found anything in the evidence at the time that

5    referenced seeds from Mexico?

6    A.   No, ma'am.

7    Q.   Were you the case agent on this case?

8    A.   Myself and Lance Abbott.

9    Q.   Was the case turned over to Mr. Abbott?

10   A.   Yes, ma'am.

11   Q.   As a federal case?

12   A.   Yes, ma'am.

13   Q.   You indicated that the guns were reviewed.  Isn't it a fact

14   that the .357 was loaded, was the only gun that was loaded?

15           MR. BYRNE:   Your Honor, we object.  It's been asked

16   and answered.

17           MS. HARDWICK:   Your Honor, this is

18   cross-examination.

19           THE COURT:   Well, he -- all right.  I'm going to --

20   the rules of evidence don't apply to this proceeding, so I'm

21   going to let you ask that question, Ms. Hardwick.

22   A.   I treat every gun as though it were loaded, and I really

23   can't recall if this gun was loaded that day or not.  It may

24   have been.

25   Q.   And Mr. Byrne asked you whether or not he refused to answer

`1   any questions.  Did you know to ask him those questions

2   regarding the seeds that he had gotten from both Amsterdam and

3   Mexico?

4   A.  No, ma'am.

5   Q.  During the time that that he was cooperating and showing

6   you where all the evidence was, isn't it a fact, Captain

7   Majors, that everything he showed you you would have found?

8   Would that be a fair statement?

9   A.  Yes, ma'am.

10  Q.  Everything that that he showed you regarding where the

11  marijuana was stored, would that have been an area that you

12  would have searched?

13  A.  Yes, ma'am.

14  Q.  And searching those areas, would you have seized those

15  items?

16  A.  Yes, ma'am.

17  Q.  Would you have seized the books?

18  A.  Yes, ma'am.

19  Q.  And would you have seized all of the marijuana seeds?

20  A.  Yes, ma'am.

21  Q.  And would you have seized all of the marijuana plant

22  material that was in the five-gallon buckets?

23  A.  Yes.

24  Q.  And in the refrigerator?

25  A.  Yes.

1    Q.   Isn't it true also, Captain Majors, that there were a

2    couple of small items that you did find that Mr. Rush did not

3    show you?

4    A.   Yes.

5            THE COURT:  Can you repeat that?  I'm sorry,

6    Ms. Hardwick, can you repeat that question?  Some of it I

7    didn't get.

8            MS. HARDWICK:  I'm sorry, your Honor.

9    Q.   Isn't it a fact, Captain Majors, that there were a couple

10   of small items that you did find that Mr. Rush did not show

11   you?

12   A.   Yes.

13   Q.   In the safe, in addition to the five long guns and the .357

14   magnum pistol, wasn't there some cash found in the safe?

15   A.   Yes, ma'am.

16   Q.   And the cash was approximately $640, I believe; is that

17   correct?

18   A.   Yes, ma'am, that sounds right.

19   Q.   And the cash was in $20 bills each, all $20 bills?

20   A.   I believe that's correct.

21   Q.   And that money was contained in the safe where the

22   marijuana was found?

23   A.   Yes, ma'am.

24   Q.   And the marijuana was in the safe where the .357 pistol was

25   found?

1   A.  Yes, ma'am, that is correct.

2   Q.  Along with the other guns?

3   A.  Yes.

4   Q.  He stated that he sold some of the marijuana during the

5   time that Mr. Rush was giving you a statement.  Would you treat

6   a statement, a confession by the defendant differently from a

7   debriefing?

8   A.  Yes, ma'am.

9   Q.  Would you explain to the Court, if you can, the other

10  details that you would go into regarding a debriefing versus a

11  confession being made by a defendant?

12          MR. BYRNE:  Your Honor, we object on the grounds of

13  Rule 403 and the relevancy as to the distinctions, because we

14  respectfully suggest that the distinction that a law

15  enforcement officer who's trained with more than 20 years'

16  experience and that which a citizen understands between

17  official interrogation and, quote, debriefing, we suggest is a

18  line that the safety valve does not require a citizen in order

19  to effect use of that to be able to discern with.  We

20  respectfully object.

21          MS. HARDWICK:  Your Honor --

22          THE COURT:  You may have the question.

23          You may answer, Captain.

24  Q.  Would you explain the difference?

25  A.  Okay.  Normally, after we get to the stage that we got to

1    on this evening, we might come back later or might expect to

2    get a phone call from a defendant's attorney wanting to provide

3    us with more information, try to help us make more cases and

4    try to work something off and give us additional information

5    about evidence in crime.

6    Q.  Mr. Byrne asked you whether or not you contacted Mr. Rush.

7    Isn't it a fact, Captain Majors, that you knew Mr. Rush was

8    represented by counsel from the very early stages of this case?

9    A.  Yes, ma'am.

10   Q.  And are you allowed to contact a defendant, based on your

11   law enforcement experiences, when you know that he's

12   represented by counsel?

13   A.  No, ma'am.

14              MR. BYRNE:  Redirect, if I may, your Honor.

15              THE COURT:  Yes.

16                   REDIRECT EXAMINATION

17   BY MR. BYRNE:

18   Q.  Drawing your attention to the Government's Exhibit 2,

19   second full paragraph, did he explain to you that the tabs in

20   the seed containers are germination dates?

21   A.  Yes, sir.

22   Q.  Did you observe the tabs in the canisters?

23   A.  Some of them, yes.

24   Q.  And did you examine them to determine if it apparently had

25   the germination date and the location?

1   A.   Yes.

2   Q.   With regard to the couple of small items referred to, where

3   were the small items, couple of small items obtained from?

4   A.   If you look on Defendant's Exhibit Number 2 -- is that 2?

5   Q.   Yes.

6   A.   The top photograph, there's a counter on the right-hand

7   side of the photograph that appears to have like a small

8   Crock-Pot on the shelf there.

9   Q.   Yes.

10  A.   There was a little bit of residue and some seeds in that

11  area.

12  Q.   Now, did you -- was there enough residue or seeds for you

13  all to bag?  Did you obtain those items with residue and two or

14  three seeds and bag them for evidence?

15  A.   I don't know.  I'd have to check the list to see.

16  Q.   Let me show you what purports to be the certificate of

17  analysis and the description of the evidence received by the

18  Department of Forensic Science Certificate of Analysis marked

19  as Exhibit 4 for identification.

20            What is Defendant's Exhibit 4 for identification?

21  A.   This is a Department of Forensic Science Certificate of

22  Analysis.  It's based on the evidence apparently that Lance

23  Abbott of ABI submitted to forensic science.

24  Q.   The items that you described as a couple of small items to

25  Mrs. Hardwick, are they contained on what was submitted to the

1   Department of Forensic Science for analysis?

2   A.   I don't see anything on this document that would represent

3   that, no, sir.

4   Q.   Okay.  And who do you know Sherwin Boswell to be?

5   A.   He's a forensic scientist at Auburn DFS.

6            MR. BYRNE:   Exhibit 4 for identification is

7   offered.

8            MS. HARDWICK:   No objection.

9            THE COURT:   Okay.   Defendant's Exhibit 4 is

10   admitted.

11            (Exhibit 4 received into evidence.)

12   BY MR. BYRNE:

13   Q.   With regard to the cash that was found, did the gun safe

14   appear to be the only secure location in that residence that is

15   capable of being locked?

16            MS. HARDWICK:   Your Honor, we would object.   It

17   calls for speculation for this witness to determine what else

18   would have been a secure area in someone else's residence.

19            THE COURT:   Sustained.

20   BY MR. BYRNE:

21   Q.   With respect to the cash also located in that, did you find

22   certain credit cards on the floor of the safe and the will for

23   Mr. Rush's parents on the bottom of the safe or on the shelf?

24   A.   I don't recall what else was in the safe, no, sir.

25   Q.   Do you remember if there were documents that one might

Page 53

1   describe as private papers; that is, a deed, an abstract, a

2   will, those kinds of matters?

3   A.   I'm quite sure that there was something else in there, but

4   I don't know what those -- I don't recall what the substance of

5   it was, no, sir.

6   Q.   As I understand it, with regard to the weapons, did you

7   determine -- with regard to the weapons listed on the exhibit,

8   did you determine whether or not they had been recently fired?

9   A.   No, sir.

10  Q.   With respect to a weapon if you had found one loaded, would

11  you have before securing it again emptied it?

12  A.   No, sir.

13  Q.   Did you remove any rounds of ammunition from any of the

14  weapons that you found inside the house?

15  A.   No, sir.

16  Q.   There was a reference to not contacting a defendant when

17  counsel is represented.  When did you find out that Mr. Rush

18  was represented?

19  A.   I don't recall the date.

20  Q.   Was it more than two weeks following the events of May 29?

21  A.   I don't recall the date.

22  Q.   Did he have counsel at his initial appearance before the

23  United States magistrate judge for this district?

24  A.   I was not here for that appearance.  I don't know that.

25                    MR. BYRNE:   Those are my questions, your Honor.

1          THE COURT:  Okay.  Anything further, Ms. Hardwick?

2          MS. HARDWICK:  No, sir, your Honor.

3          THE COURT:  I have one question for you, Captain,

4    before you go.

5          THE WITNESS:  Yes.

6          THE COURT:  Captain, why didn't you take these

7    weapons?  Why didn't you seize them?

8          THE WITNESS:  Well, looking back now, all I can say

9    is that was a mistake on our part.

10          THE COURT:  And why do you say it was a mistake?

11          THE WITNESS:  In our state court, sometimes they're

12    not -- don't appear to be an issue as much as they are here,

13    unless we can show that they're directly involved or unless

14    we're charging them with something in the crime.

15          THE COURT:  Did you conclude that they were not

16    involved in the marijuana production on this property?

17          THE WITNESS:  Well, I can't say that, your Honor,

18    but when I say included in the crime, I mean that they -- we

19    weren't threatened with those weapons.  No one was in

20    possession of those weapons as far as when we confronted him.

21          THE COURT:  Okay.

22          Counsel, do either of you have any questions to

23    follow up the questions I've asked Captain Majors?

24          MS. HARDWICK:  Yes, sir, your Honor, I do.

25          THE COURT:  All right, Ms. Hardwick.

1            MS. HARDWICK:  Yes.

2                    RECROSS EXAMINATION

3    BY MS. HARDWICK:

4    Q.  Captain Majors, with no effort to embarrass you or Agent

5    Lance --

6            THE COURT:  I couldn't hear that question.  Would

7    you repeat that question again, ma'am?

8    Q.  My question was:  Without an effort to embarrass Captain

9    Majors or Special Agent Lance, was somewhat of a charging

10   decision made on the scene that should not have been made?

11           MR. BYRNE:  Your Honor, we object under Rule 403.

12   It calls for speculation, and we also respectfully suggest that

13   it is subserving and violates under the balance of Rule 403.

14           THE COURT:  I'm going to exclude this.  I think the

15   witness has testified that he made a mistake that day and he

16   should have seized those weapons.

17           MS. HARDWICK:  That's the only thing that the

18   government was trying to point out, your Honor.

19           THE COURT:  All right.

20           MS. HARDWICK:  I think that clarifies it.

21           THE COURT:  Thank you.

22           Thank you very much, Captain.

23           Let me tell you, I don't know what it is what the

24   other witness would say, but I have a question for you,

25   counsel.  Actually, I think I've come to some conclusions about

1    this.

2            Can you tell me before I announce what conclusion I

3    have, Mr. Byrne, what it is that the agent, the other agent --

4    was it Agent Abbott -- or the other person there whom you would

5    call to testify with respect to cooperation?

6            MR. BYRNE:  Your Honor, with regard to Corporal

7    Howell, he was the ABI eradication team leader on that occasion

8    that initially confronts Mr. Rush, and I would expect that he

9    would say he cooperated with him and apparently did not have a

10   weapon on his person.  And I think that's not a disputed fact

11   at all.

12           The Court may recall that Corporal Howell was on

13   the stand during the --

14           THE COURT:  Yes --

15           MR. BYRNE:  -- abbreviated trial, and he was asked,

16   after some predicate questions were asked by the government,

17   the number of investigations of a similar nature that he had

18   undertaken.  He was asked a question in substance out of all

19   those investigations, on how many occasions have you not seized

20   the weapons and taken them from the residence?  And, as I

21   recall his statement to the Court on that occasion before your

22   Honor, was there were no other occasions.  We would expect him

23   to testify similarly today.

24           THE COURT:  All right.

25           Now, Ms. Hardwick, can both you and Mr. Byrne come

1    to the podium?  I want to ask the question that -- it may be

2    that only the two of you can answer.

3              When we started this trial -- when we started this

4    case, we started a trial in the morning, and Ms. Hardwick said

5    in a conference that we had in a robing room to Mr. Byrne and

6    to me, I think -- words to this effect -- Ms. Hardwick -- I

7    think we might be able to discuss something that could resolve

8    this case.  Do you remember having that -- saying something

9    like that, Ms. Hardwick?

10             MS. HARDWICK:  Yes, sir.

11             THE COURT:  Thereafter I -- we had a recess, and

12   over the lunch break, the two of you, you, Ms. Hardwick,

13   Mr. Byrne, talked about this case.  And then following the

14   lunch break I think you told me, Ms. Hardwick, that you had to

15   discuss what you and Mr. Byrne had discussed with a supervising

16   U.S. attorney who was in another courtroom; and then you had

17   that discussion, and then Mr. Rush entered a plea.  Have I got

18   those circumstances correct?

19             MS. HARDWICK:  That's correct, your Honor.

20             MR. BYRNE:  Yes, your Honor.

21             THE COURT:  In the discussion in the interim

22   between your meeting with me in the robing room and the plea,

23   did you try at all to get any statement -- and I ask you if you

24   tried, Ms. Hardwick, and I ask Mr. Byrne, did Mr. Rush make any

25   statement regarding the circumstances of this offense?

.1              MS. HARDWICK:  In this regard?

2               THE COURT:  Yes, ma'am.

3               MS. HARDWICK:  Regarding -- no, sir, your Honor.

4               THE COURT:  I'm not talking -- typically the way

5    this happens, the defendant says I'm going to plead guilty, and

6    the government says will you make a proffer to me?  Isn't that

7    the way it happens typically?

8               MS. HARDWICK:  No, sir, your Honor.  Normally the

9    defense counsel says that my client wishes to make a proffer,

10   what can the government do for us?  That's how that normally

11   happens.

12              THE COURT:  All right.

13              MS. HARDWICK:  That has never happened in this

14   case.

15              THE COURT:  Okay.

16              MS. HARDWICK:  And the issue that we were

17   attempting to resolve was simply -- was only the gun issue.

18              There's never been a discussion regarding the count

19   one, which is the marijuana charge and what would be the

20   guidelines characteristics that would be applied.

21              The government's conversation with the chief, it

22   was a criminal chief that was in another courtroom,

23   Mr. Franklin, and what I needed to find out with Mr. Franklin,

24   because our office has a pretty strong policy on guns, whether

25   or not we could drop the gun count and -- based on a plea to

1    count one.

2            But, no, I did not ask any questions, and your

3    Honor, we normally do not, because when a person is represented

4    by counsel, as the Court does know, we cannot approach that

5    person.  And that's what the agent was testifying to.  There's

6    no way they would have made a contact.  We strongly urge them

7    not to do that.  When a defense counsel is seeking downward

8    departures, substantial assistance with a 5K, normally we get a

9    phone call saying my client wishes to be debriefed, can you

10   arrange an agent to debrief my client?  That has never happened

11   in this case.

12           THE COURT:  Okay.  Mr. Byrne, do you want to

13   comment on this that?

14           MR. BYRNE:  She correctly cites our discussion on

15   that occasion was the -- was encapsulated around the government

16   ultimately recommending that upon sentencing count two would be

17   dismissed, and that we would enter a conditional plea under

18   Rule 11 to preserve those search questions that were discussed

19   with your Honor earlier that day in chambers.

20           THE COURT:  All right.

21           MR. BYRNE:  I did not -- as an officer of the

22   Court, I did not tender the client to Ms. Hardwick for further

23   interrogation.

24           THE COURT:  All right.  I think I'm coming to some

25   conclusions about the safety valve question.  Bear with me, I'm

1    looking for some notes I have made.

2              MS. HARDWICK:  Onto the Court's earlier comment

3    regarding the Matos case --

4              THE COURT:  Yes, ma'am.

5              MS. HARDWICK:  Your Honor, in that case, there was

6    a debriefing in that case.  I believe that there had been --

7    and even with that debriefing, the court concluded there that

8    the defendant could not -- and I'm referencing page 40 of that

9    case -- that the defendant could not simply respond to

10   questions while at the same time keeping secret pertinent

11   information concerning the offense of conviction or related

12   offenses that falls beyond the scope of direct interrogation.

13             So that sticks directly to what the Court was

14   addressing here today, that the government could not play cat

15   and mouse games.  But the government has never played cat and

16   mouse games with Mr. Rush.  The government has never had an

17   opportunity to debrief Mr. Rush, and we contend that that

18   burden is on him to come forward.

19             We listed that in the Flanagan case when in that

20   case it was matter of first impression when the 5th Circuit

21   addressed the question of who has the burden of ensuring the

22   defendant has provided all information, and the district court

23   there inquired whether the government had asked for certain

24   information and said that the government could not just sit

25   back and not -- that it did not believe -- the government

1    responded in that case that it didn't believe that it had the

2    responsibility to do so.  And then the district court said that

3    the government could not complain regarding Flanagan's lack of

4    answering questions if the government doesn't ask him the

5    questions.

6              When that case was appealed, the appellate court

7    said -- took the opposite view, that the language of the safety

8    valve provision indicates that it's the defendant's burden to

9    provide the government with all information, and that it went

10   further to say that as a general rule, the parties seeking the

11   adjustment in the sentence is the party that has the burden of

12   proving the facts to support the adjustment.

13             So, your Honor, we would submit that based on the

14   Matos case, when they were in a debriefing -- we've never been

15   close to a debriefing in this case, and what he's relying on is

16   questions and answers in a statement, a confession in this

17   case.  And a lot of things happened in this case that shouldn't

18   have happened, for instance, the guns not being taken, but he

19   should not benefit from a mistake that the officer has readily

20   made that was made by law enforcement.  Charging decisions were

21   inadvertently made at the scene, which should not have ever

22   been made, and that's why this case has such a history with how

23   it was charged initially.

24             And at this point, Mr. Rush is still seeking to get

25   a benefit from something that he hasn't done.  And at this

1    date, if we ask him a question, I don't believe he'd answer the

2    questions today.  It's not available to him, and I don't

3    believe he'd tell us today where he got his seeds from or who

4    he sold the marijuana to.

5              THE COURT:  First of all, let me say that I

6    appreciate the effort that counsel have put into this.  It has

7    been a perplexing issue for me.

8              I want to start with the proposition that under the

9    safety valve, which is codified as in 18 United States Code

10   section 3553(f) and is restated in section 5C1.2, that among

11   the things the defendant must do to qualify for safety the

12   valve is to not later than the time of the sentencing hearing

13   truthfully provide the government all information and evidence

14   he has concerning the offense or offenses that were part of the

15   same course of conduct or of a common scheme or plan.

16             I understand that provision to mean that sometime

17   before the sentencing hearing the defendant has to provide the

18   information I've just described.  I agree with the United

19   States that the burden is on the defendant to come forward with

20   that information.

21             Now, in this case, what we have is the -- is

22   cooperation by the defendant with the arresting law enforcement

23   officers.  I find that at the time of his arrest, Mr. Rush

24   truthfully told law enforcement officers that he had cultivated

25   plants from seeds, that he had been engaged in this activity

1   for at least 20 years, that he used some of the marijuana from

2   the seeds himself, that he gave some of it away, and he sold

3   what was left over.  He directed the officers to a refrigerator

4   that contained some marijuana seeds and to a locked safe that

5   contained some more seeds and some firearms.  He did this

6   cooperatively with the United States -- excuse me, with the law

7   enforcement officers then on the scene.

8           It's not clear to me from the evidence that is now

9   before me when it is that Mr. Rush acquired counsel, but I

10   don't think that matters for my decision, because there were

11   times in which he did have counsel, and I think they're

12   relevant times to the question I have to decide.

13          First let me say -- maybe this isn't first, but let

14   me say by way of an introduction to what my conclusion is that

15   the definition of the term "offense" as used in the safety

16   valve includes, according to the application note, the offense

17   of conviction and all relevant conduct.  Section 1B1.3 of the

18   guidelines define relevant conduct to be all acts and omissions

19   committed, aided, abetted, counseled, commanded, induced,

20   procured or willfully caused by the defendant that occurred

21   during the commission of the offense of conviction in

22   preparation for the offense or in the course of attempting to

23   avoid detection or responsibility for the offense.

24          The government argues to me that Mr. Rush has not

25   provided all information he has with respect to what the

1   guidelines describe as relevant conduct.  Specifically, he has

2   not provided information concerning his preparation for the

3   offense; namely, where he acquired the seeds for the plants, or

4   information concerning other offenses that are part of the same

5   course of conduct or common scheme or plan with the offense of

6   conviction; namely, the identities of the persons to whom he

7   sold or gave marijuana.

8           There's no 11th Circuit case that's precisely on

9   point.  There is an 11th Circuit case called United States v.

10  Ortiz that stands for the principle that the defendant has the

11  burden of showing that he has met all five criteria of the

12  safety valve.  And in the Ortiz case, the 11th Circuit quotes

13  with approval the decision of the 5th Circuit in United States

14  v. Flanagan, and the decision of the 4th Circuit in United

15  States v. Ivester, I-v-e-s-t-e-r.  In both those cases the

16  court held the burden is on the defendant to provide the

17  government with all information he has, and that there is

18  generally no duty on the government to seek out information

19  from a defendant who seeks the protection of the safety valve.

20          The 1st Circuit in May of this year decided in

21  United States v. Matos that the safety valve statute

22  requires -- fairly read that a defendant be forthcoming.  It

23  says he simply cannot respond to questions while at the same

24  time keeping secret pertinent information concerning the

25  offense of conviction and related offenses that fall beyond the

'1   scope of interrogation.  And that's what we have here.  We have

2   full cooperation to the extent that officers have inquired

3   about information of Mr. Rush.

4              I suspect that it's probably arguable that a

5   defendant might reasonably conclude that, you know, the

6   officers are only interested in what they ask about and that he

7   need not provide other information.  But there were times

8   during the course of this case when there was an opportunity

9   for Mr. Rush to have made the full disclosure and that those

10  opportunities were not taken.  I specifically have reference to

11  the time when the plea was being negotiated when I was down in

12  Montgomery or the details were negotiated.  I recognize that

13  the parties were talking primarily about the gun, but that was

14  a time when a full proffer could have been made.

15             There appeared to be -- there might have been some

16  opportunity during the course of the suppression hearing, but

17  it seems to me at the time of the suppression hearing both

18  counsel and the defendant were focused on something else;

19  namely, getting the evidence suppressed in the first instance.

20  It's not clear to me that it would be reasonable to expect a

21  defendant at that point to say everything -- to tell everything

22  he knew while he was trying to get the evidence suppressed.

23  But there was an opportunity, and I think that the day the

24  trial started there was an opportunity for the defendant to be

25  fully forthcoming.  It was not taken, and, therefore, I find

1    that the requirement that the defendant truthfully come

2    forward -- that he come forward himself and truthfully give the

3    government all the information he has has not been met.  What

4    has not been revealed is where the seeds came from and to whom

5    they have been distributed.

6              I note that in the Flanagan case, Flanagan talks

7    about the burden the government -- I believe it's Flanagan --

8    they talk about the fact that the burden is on the defendant to

9    provide this information even if the government already has the

10   information, because the cases, and the government has cited

11   one, Safir, talk about the difference between providing enough

12   information to a -- to get acceptance of responsibility and

13   what you must do to go -- that you must go further if you want

14   the benefit of the safety valve.

15             The defendant in this case has provided enough

16   information to get the benefit of acceptance of

17   responsibility.  I do not find, however, that he's provided the

18   information, as was his burden, to get the benefit of the

19   safety valve.  I don't, therefore, need to discuss the gun

20   question, because I find that the defendant cannot meet the

21   requirement of the provision, I believe it's provision two,

22   that requires that he truthfully provide all information he has

23   concerning the offense or offenses that were part of the same

24   scheme or conduct or of a common scheme or plan.

25             All right.  I think that brings me now to the

1    question of the sentence.

2           MR. BYRNE:  Your Honor, may I address the Court for

3    one second and ask the Court to respectfully reconsider in

4    light of the United States v. Santiago case, it is a

5    1st Circuit case reported at 96 F.3d 517, and what I think is

6    instructive about that case, it talks about whether or not in

7    Martinez the Court confronted a slightly different question;

8    that is, whether the defendant provided truthfully, quote, all

9    information, establishes an affirmative duty on the part of the

10   defendant to offer himself or herself up to the government for

11   debriefing.  There is footnote that we suggest is instructive.

12   That is footnote 24 basically says that the fact that a full

13   debriefing is not statutorily required does not provide --

14   although a full answer to the question as a practical matter, a

15   defendant who declines to offer himself for debriefing takes a

16   very dangerous course.

17          In this case, he did not decline a debriefing, nor

18   in this case does -- and I respectfully suggest to the Court --

19   I'm not arguing with the Court -- it is not incumbent upon a

20   person, we suggest, to go beyond -- there is never a question

21   in any drug case that I as an experienced agent could not think

22   of with 20/20 hindsight and much to think about it something

23   else I would like to ask him.  And the Court is really

24   presented with the question is if he says I will come in and

25   give a debriefing, what more would with regard to these subject

1  offenses could he have said after this statement is conducted

2  in three segments, not in one -- one sitting but in three

3  segments with intervening investigation.

4         We respectfully suggest to the Court he has met a

5  preponderance of the evidence standard to meet the safety

6  valve.  It's not beyond a reasonable doubt, but we believe that

7  we have proven by a preponderance of the evidence that he's

8  made that showing.  Thank you.

9         THE COURT:  Thank you very much.

10        I concede to both of you this is a difficult case,

11  because I'm persuaded that Mr. Rush provided all the

12  information he was asked about, and, you know, the officers

13  commented on the level of his cooperation; but, as I say, I

14  think that there -- the safety valve does put a burden the

15  defendant -- on any defendant to come forward.  And I do

16  this -- I rely in coming to that conclusion on the fact that

17  the 11th Circuit in Ortiz has quoted and cited with approval

18  these two cases I refer to, Flanagan from the 5th Circuit and

19  Ivester from the 4th Circuit, both of which talk about the

20  burden of the defendant to come forward, whether he's asked or

21  not asked, to provide information; and since the defendant did

22  not come forward in this case, I believe that the 11th Circuit

23  would hold that the safety valve does not apply.

24        Now, typically when I impose sentence, I ask the

25  government for its recommendation first.  Ms. Hardwick, do you

1   have a recommendation?

2              MS. HARDWICK:  Your Honor, this is a mandatory

3   minimum statutory case, which the statute requires that the

4   minimum sentence in this case be 60 months, and that is the

5   government's recommendation.  It is by statute that the

6   government makes that recommendation.

7              THE COURT:  Okay.  Mr. Byrne?

8              MR. BYRNE:  Your Honor, obviously we ask the Court

9   to impose the minimum sentence that is available under the law

10  to the accused, and understanding the Court's prior rulings, we

11  will not belabor that point with regard to the issue of

12  downward departure.  We basically contain those facts which we

13  believe would suggest to this Court that the mandatory minimum

14  is the appropriate sentence, and in this case we respectfully

15  suggest, with all due respect to the Court and to the Congress

16  of the United States, that the sentence, even at 60 months, is

17  excessive, given the offense and surrounding circumstances, but

18  we ask the Court to impose the minimum sentence.

19             THE COURT:  Thank you very much.

20             Mr. Rush, the rules provide that you have an

21  opportunity to say whatever you'd like to say before sentence

22  is imposed, and I want to give you, sir, that opportunity now.

23                  (Discussion off the record.)

24             MR. BYRNE:  Your Honor, he advises me that he does

25  not wish to make any statement to the Court.

1            THE COURT:  Okay.  All right.

2            MR. BYRNE:  Beyond what he's already said.

3            THE COURT:  Thank you very much.

4            Mr. Byrne, do you see any reason why I should not

5   now impose sentence?

6            MR. BYRNE:  No, sir, your Honor.

7            THE COURT:  Ms. Hardwick, do you see any reason why

8   I should not now impose sentence?

9            MS. HARDWICK:  No, your Honor.

10           THE COURT:  All right.

11           Mr. Rush, pursuant to the Sentencing Reform Act of

12  1984, it's the judgment of the Court that you be committed to

13  the custody of Bureau of Prisons to be imprisoned for a total

14  of 60 months.  I'm going to give you a period of time which I

15  will discuss with counsel to surrender in person to the

16  facility designated for you by the Bureau of Prisons.

17           I'm going to impose the mandatory $100 special

18  assessment on you, and to impose a fine of $5,000, which will

19  be due in full a year from now.  That will be September 3,

20  2004.  You can pay this fine in installments over that period

21  of time.

22           Upon your release from imprisonment, you'll be

23  placed on supervised release for a term of four years, and

24  within 72 hours of your release from custody you'll report in

25  person to the probation office in the district where you are

1    released.

2              While you are you on supervised release, you'll

3    comply with the mandatory and standard conditions of the

4    guidelines.  You will participate in drug testing and treatment

5    as directed by the probation office.  You will provide the

6    probation office any requested financial information.

7              I am advised that it is the policy of the court,

8    that is, the Middle District of Alabama, to impose a

9    requirement of supervised release that you submit to random

10   searches of your persons, residence, office or vehicle.  Am I

11   correct about that, counsel?  Probation advises --

12             MR. BYRNE:  Yes, your Honor.

13             THE COURT:  Okay.

14             MS. HARDWICK:  That is correct, your Honor.

15             THE COURT:  And I find that there's no identifiable

16   victim in this case who has incurred a financial loss as a

17   result of this offense.

18             Are there any objections or questions to the

19   sentence as I've imposed it?

20             MR. BYRNE:  Your Honor, we respectfully would ask

21   the Court to note that we continue in our objection with regard

22   to the safety valve, and we simply want those noted on the

23   record.

24             We also ask this Court to please credit toward the

25   sentence adjudicated by the Court jail credit for two days.

 1    Mr. Rush was incarcerated on the afternoon and evening of May

 2    29th.  He was incarcerated on May 30 in the United States

 3    marshal's lockup pending appearance before the United States

 4    magistrate judge.  I am advised that he was released

 5    approximately 3:00 p.m. that afternoon.  We ask respectfully

 6    that this Court allow two days of jail credit toward the

 7    application of the mandatory minimum sentence.

 8              THE COURT:  I think all I can do is recommend that

 9    be done by the Bureau of Prisons, and I will make that

10    recommendation.

11              MR. BYRNE:  Yes, your Honor.

12              THE COURT:  Let me also -- I provided for reporting

13    by Mr. Rush to the facility, self-reporting, and I just need a

14    date for that.  I propose -- what -- counsel, what do you

15    propose?

16              MS. HARDWICK:  Your Honor, under the statute, the

17    government respectfully objects.  The statute requires, because

18    of the nature of the offense, unless there is some extenuating

19    circumstances found by the government for Mr. Rush to remain

20    out, the statute mandates that he goes in custody because of

21    the offense today without volunteer surrender, and I cannot

22    find anything in the statute that makes exception.  I know that

23    there have been circumstances when the defendants are pending

24    testifying in other cases, they're working on ongoing

25    investigations, but there is no reason that Mr. Rush should not

. 1  be taken into custody.

2            MR. BYRNE:  Your Honor, we would respectfully

3       respond that we believe that in the presentence report his

4       pretrial services officer, Jason Dillon, has indicated that he

5       in his judgment is not a flight risk, he has no -- I don't

6       believe would have any objection to his being allowed to remain

7       out pending designation of an institution, and there were no

8       credible threats of violence in this case, did not result in

9       death or bodily injury, and that the defendant completely

10      cooperated with law enforcement at the time of his arrest.  He

11      has surrendered his passport.  He is not a flight risk, and we

12      believe under these circumstances that the Court retains the

13      discretion to allow him to turn into a designated institution.

14            MS. HARDWICK:  Your Honor -- and the Court knows

15      that the probation officer is present who did write that in

16      there, I think he will acknowledge to the Court that was a

17      mistake because he had not referenced the nature of the

18      offense.

19            THE COURT:  Come a little closer to the microphone.

20            MS. HARDWICK:  I'm sorry, your Honor, it's tilted.

21            The government stated that the probation officer

22      who originally did make that statement is present in the Court

23      and will acknowledge that that was not correct.  The statute

24      mandates under 3143 that because of the nature of its offense,

25      Mr. Rush must be taken into custody.  And I think he's

1    present.  The government is prepared to call him as a witness

2    to state that was not a correct statement after he --

3                 THE COURT:  It doesn't matter, frankly, whether

4    it's a mistake or not.  I'm bound by what the statute says, and

5    I have to --

6                 MS. HARDWICK:  The statute --

7                 THE COURT:  I'm looking at section 3143, and I have

8    to make the finding that there's a substantial likelihood that

9    a motion for acquittal on new trial will be granted and that I

10   have to find by clear and convincing evidence that the -- that

11   person is not likely to flee or pose a danger to another person

12   or the community.

13               I think I can make the finding that's required by

14   the second prong.  The question that I have to find is whether

15   there is a substantial likelihood that a motion for acquittal

16   or new trial will be granted, and I -- in that -- that really

17   requires me to make some judgment about the suppression issue,

18   which I'm -- since I was not involved in that, I'm not sure how

19   strong that matter is, how strong your --

20               MR. BYRNE:  Your Honor, we would --

21               THE COURT:  I'm sorry, sir.

22               MR. BYRNE:  Your Honor, we would respectfully

23   suggest that the question we believe is a serious question of

24   law to be presented to the 11th Circuit.  We believe that the

25   argument has merit.  We believe that the magistrate judge who

1    ruled in favor of Mr. Rush suppressing the evidence opinion

2    sets out substantial thought, and we believe that an appraisal

3    of the district court's opinion reversing her, based on

4    argument -- I'm not fully prepared to argue this at this time,

5    but we'd be willing to with a day or two of preparation.  But I

6    have done some research.

7           The -- there are two decisions that are relied upon

8    by Judge Thompson, one of those is in a case that has been --

9    both are outside the 11th Circuit.  Not addressed is the

10   leading question of factor and other cases in the 11th Circuit

11   a judge who did not distinguish those the case that it does

12   cite -- and I can't remember whether it's the 1st Circuit case

13   or the 3rd Circuit case -- is criticized.  I would be prepared

14   and can be prepared to make that argument when I get ahold of

15   some other papers that I did not bring with me.

16          We believe that it is a substantial question.  The

17   magistrate judge observed the credibility of the witnesses, the

18   district court did not.  Therefore, the credibility of the

19   witnesses as determined by the magistrate judge is -- carries

20   with it the assumption of correctness, and we would

21   respectfully suggest there's a substantial question of law

22   presented, and we believe that the court should band on the

23   question of whether or not there were exigent circumstances or

24   there were exigent circumstances created by law enforcement

25   officers.

1    We would be happy to provide the Court with a

2    memorandum of law and authorities touching upon the

3    distinction, the case cited by Judge Thompson and law relative

4    to the search and seizure issue for a determination that this

5    presents a serious question.  It is not done for the purpose of

6    pure delay or any other frivolous or improper purpose.

7         THE COURT:  Let me -- before -- are you about to

8    speak to this question, Ms. Hardwick?  Are you?  Were you about

9    to --

10        MS. HARDWICK:  Yes, your Honor.  Very briefly.

11        THE COURT:  I just want to take a look at the

12   statute again, please.

13        I'm thinking the section I was reading from and the

14   section you cited to me, section 3143, is not a section that

15   directs itself to self-reporting but one that talks about

16   whether the defendant may be released or detained pending

17   sentence or appeal.  You say the probation officer is there?

18        MS. HARDWICK:  Yes, he is, your Honor, and it is --

19   in this case it would be appealed.  He is being sentenced now,

20   and, your Honor, in all -- what should have happened is he

21   should have been taken into custody once he entered his guilty

22   plea.

23        THE COURT:  Yes, I think that's the point.

24        MS. HARDWICK:  Pending -- exactly.  He should have

25   been taken into custody then, and since he was not, he

1   definitely should be taken into custody now pending appeal, and

2   this section clearly states that the judicial officer shall

3   order him, if he falls under either a crime of violence under

4   A, B, or C, and in this case he falls under C, unless the Court

5   can find that he's likely to get an acquittal.

6               This wasn't a trial, he entered a guilty plea, or a

7   new trial, and/or if there's -- he's not likely to flee.  The

8   government is not arguing whether or not he will flee.  We

9   cannot contest that he's abided by the instruction by the

10  probation officer.  However, at this point he has been found

11  guilty, and there are no other extenuating circumstances that

12  would allow him to remain out.

13              MR. BYRNE:  Your Honor, we suggest that under the

14  conditions of Rule 11(a), the plea is conditioned, and under

15  those circumstances, if were we to prevail under Rule 11(a) of

16  the Federal Rules of Criminal Procedure, he is then allowed to

17  withdraw the plea of guilty.  And so we believe that the

18  distinction in what Mrs. Hardwick is suggesting to the Court is

19  under Rule 11(a), it is conditioned upon the appeal, and if

20  that appeal should prove favorable to Mr. Rush, he is permitted

21  then to withdraw his plea of guilty under Rule 11(a).

22              THE COURT:  All right.

23              MS. HARDWICK:  Your Honor, the government feels

24  strongly that the district court judge who viewed the

25  recommendation of the magistrate judge -- obviously the

1   government feels that that decision was correct and that's why

2   the government appealed the recommendation of the magistrate

3   judge, because we felt strongly that the law would support the

4   facts in that case.

5            So both parties obviously are going to stand here

6   today and say that they believe that they're going to prevail.

7   I think the Court was correct earlier in stating that the Court

8   may not be in the best position to say in this case that he's

9   likely to get an acquittal of his sentence in this case.  So he

10  will not be able to meet those prongs unless the Court can

11  state that you can make that finding, having not heard the

12  testimony in that case or the facts.

13           THE COURT:  Yeah, I'm in a very difficult position,

14  because I, frankly -- I did read the relevant decisions when I

15  was there, but because the matter had been resolved by the

16  other two judicial officers, I, frankly, did not give the

17  matter substantial attention.  And so I cannot -- Ms. Hardwick

18  is right, I can't make the finding that the appeal raises

19  substantial question of law likely to result in reversal.  And

20  since I can't make that finding, I think I am required to

21  remand Mr. Rush immediately to the custody of the marshals.

22           MR. BYRNE:  Your Honor, may I respectfully ask the

23  Court to indulge us in this fact:  Mr. Rush worked up until

24  yesterday at his place at Auburn University.  He needs, if I

25  may, in order to allow the Court to do -- if we could have five

1    days, submit by Federal Express to you the briefs that were

2    submitted to the Court so that you can make the determination

3    that we believe is appropriate under the statute, and that will

4    allow him to submit -- he is eligible to submit retirement

5    papers so that at least he can submit that paperwork to Auburn

6    University, and we believe that that -- the Court can make that

7    determination.  We can submit that matter to the Court and

8    allow him to remain free for five days or seven days, for you

9    to review those briefs, and them come to whatever conclusion

10   you may conclude in this without allowing him to make some of

11   those arrangements that we suggest are necessary.

12          We don't believe that it is in any substantial

13   advantage to the United States for this man, who has got a

14   productive career, he's not a threat, to remain outside and to

15   turn into a prison simply to require him to surrender today, we

16   suggest is too heavy and that he should be permitted at least a

17   few days to return here and submit himself at least so that he

18   can submit his resignation and not be terminated for

19   misconduct; that is, failure to appear at his place of

20   employment.

21          THE COURT:  Ms. Hardwick, may I just ask you

22   whether you, the United States, would oppose giving Mr. Rush

23   seven days, just seven days to report?  In other words, I would

24   take -- I would modify Mr. Byrne's suggestion and say that I

25   would order that he report -- that he be taken into custody by

1 the marshal service seven days from now if the government does

2 not object.  Let him get his affairs in order.  Now, I know --

3      MS. HARDWICK:  Your Honor --

4      THE COURT:  I know you're going to tell me what

5 is -- what the statute requires.  I'm asking really a question

6 having to do with whether the government would forebear for a

7 week to let him get his affairs in order.

8      MS. HARDWICK:  And, your Honor, I respectfully

9 understand what the Court is attempting to do.  The position

10 the government is that when I concur to that and not concur in

11 another case, then I will be viewed as being inconsistent.

12 That is one thing I try very hard not to do in my career as a

13 prosecutor, is to be inconsistent in other cases.

14      Mr. Rush has known, we've been here in this very

15 spot three times previously.  This is the third time that we've

16 come in for sentencing.  Mr. Rush has known that he faces the

17 possibility of some form of incarceration, whether it was with

18 a downward departure, with safety valve, but some form of

19 incarceration, so he has known each time he's walked in this

20 courtroom that he would possibly be taken into custody.  And to

21 come on the third time that we're before this Court and say,

22 again, I need seven days to prepare, I don't understand what --

23 what's been the thought pattern.

24      If the Court should do that, then the government

25 would remain silent on it, but I would hate to concur on the

1    record with that, your Honor, because I would being seen as

2    inconsistent with what I typically do in my cases.

3              THE COURT:  All right.  It's not your decision,

4    Ms. Hardwick.  I'm going to give you seven days, Mr. Rush.  In

5    seven days from today you report to the marshal service in the

6    Middle District of Alabama, surrender yourself at that time.

7    Seven days from now will be September 10th, September 10th you

8    surrender yourself.

9              Now, let me advise you, Mr. Rush -- I don't think

10   I've done this so far -- that you can appeal your conviction if

11   you believe there was some fundamental defect in the

12   proceedings not waived by your guilty plea or if you think that

13   your guilty plea was somehow unlawful or involuntary.  You also

14   have the right, statutory right to appeal your sentence under

15   certain circumstances, particularly if you think this sentence

16   is contrary to law.

17             With few exceptions, any appeal that you wish to

18   file must be filed within ten days of judgment being entered in

19   your case.  If you are unable to pay the cost of filing a

20   notice of appeal, you should notify the clerk of the Middle

21   District of Alabama, and if you qualify, the clerk will prepare

22   and file a notice of appeal on your behalf.

23             Is there anything further?

24             (Discussion off the record.)

25             THE COURT:  Oh, yes, my courtroom deputy has

Page 82

1    advised me that I didn't tell you what time to surrender

2    yourself.  I'm going to ask you to surrender not later than

3    12:00 noon on September 10, 2003.

4                    Anything further, counsel?

5                    THE DEFENDANT:  Yes, your Honor.

6                    THE COURT:  Mr. Rush?  Ms. Hardwick?

7                    MR. BYRNE:  No.  Thank you for your professional

8    courtesy, I appreciate it.

9                    THE COURT:  Ms. Hardwick, you have --

10                   MS. HARDWICK:  Yes, your Honor.  At this time the

11   government would move to dismiss count two of the indictment.

12                   THE COURT:  All right.  That motion is granted.

13                   If there's nothing further, then I think we're

14   adjourned.

15                   Thank you very much.  It's been a pleasure,

16   counsel, to work with you.  I'm sorry that we had these

17   technical difficulties, but I think my job is now done.  I wish

18   you all well.

19                   MS. HARDWICK:  Thank you, your Honor.

20                   MR. BYRNE:  Thank you, your Honor.

21                   THE COURT:  Thank you.

22                   (Court adjourned at 12:35 p.m.)

23                        i i i i i i i

24

25

1                           CERTIFICATION

2            I certify that the foregoing is a correct

3    transcript of the record of proceedings in the above-entitled

4    matter to the best of my skill and ability.

5

6

7

8    _____        _____

9    Debra M. Joyce                  Date

10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 84

1                           EXAMINATION INDEX

2

    JAMES MAJORS
3        DIRECT BY MR. BYRNE                          23
         CROSS BY MS. HARDWICK                         45
4        REDIRECT BY MR. BYRNE                         50
         RECROSS BY MS. HARDWICK                       55
5                           EXHIBIT INDEX

6                                              MAR  /  ADM
    Government
7      2                                                 29

8      6                                                 39

9
    Defendant's
10     2                                                 36

11     3                                                 34

12     4                                                 52

13     5                                                 34

14     7                                                 27

15     8                                                 30

16

17
                    18
19

20

21

22

23

24

25